UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
EFRAIM DIAZ,

Petitioner,

      -against-

**REPORT and RECOMMENDATION
07 CV 5379 (SJF)(LB)**

HAROLD GRAHAM,
Superintendent Of Auburn Correctional Facility,

Respondent.
-------------------------------------------------------X
**BLOOM, United States Magistrate Judge:**

Efraim Diaz ("Petitioner") files this *pro se* petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter was referred to me by the Honorable Sandra J. Feuerstein for a Report and Recommendation in accordance with 28 U.S.C. § 636 (b). For the reasons that follow, it is respectfully recommended that the petition should be denied.

**BACKGROUND**

On July 2, 1992, at approximately 8:15 a.m., petitioner rang the doorbell to Shamir Hurtado's ("Hurtado") Brooklyn studio apartment that he shared with his then-girlfriend, Consuelo Agudelo. (Tr. 370, 398.)[1] Hurtado opened the door and let petitioner into the studio. (Tr. 370, 398.) Petitioner told Hurtado that he would return later to bring money he owed for a drug deal. (Tr. 399.) Petitioner then pretended to leave the apartment when petitioner's accomplice "Papo" entered the apartment and pointed a gun at Hurtado's head. (Tr. 399.) Petitioner stood next to Papo. (Tr. 400.) Papo then pointed the gun away from Hurtado and put it to Agudelo's head. (Tr. 402.) Hurtado tried to take the gun away from Papo (Tr. 436.), but Papo

---

[1] "Tr." refers to the transcript of the jury trial, which began on July 28, 2003.

shot Hurtado in the back of the neck. (Tr. 403.) Hurtado survived because the bullet hit the chain around his neck. (Tr. 404.) Petitioner ordered Papo to kill Hurtado and then left the apartment. (Tr. 404.) Papo shot Hurtado two more times (Tr. 404, 406, 410) and shot Agudelo in the head; she died instantly. (Tr. 404-06, 499-500.) Hurtado dragged himself to the first floor of his apartment building. (Tr. 406-07.)

Responding to a radio run on July 2, 1992, at about 8:50 a.m., Police Officer Raymond Senenfelder ("Senenfelder") arrived at Hurtado's building. (Tr. 303.) Senenfelder found Hurtado bleeding on the lobby floor speaking Spanish to a female who told Senenfelder that Hurtado came from apartment "2X" and that there was someone else upstairs. (Tr. 304.) The woman translated what Hurtado was saying to Senenfelder, but Senenfelder did not hear any translated statement about the identity of the perpetrator. (Tr. 322, 328.)

Senenfelder then entered Hurtado's open apartment and found Agudelo dead on her bed. (Tr. 305.) Forensic evidence established that Agudelo died from a gunshot to the left side of her head (Tr. 499-500), and crime scene Detective Edward Wallace found only Agudelo's fingerprints in the apartment (Tr. 352-53).

The police questioned Hurtado from the time he arrived in the hospital emergency room through the following two days. (Tr. 441.) At the time, Hurtado did not give the police his real name; instead he gave the police an alias, Salu Rivas. (Tr. 407.) Hurtado told the police that two men, one black and one Hispanic, whom he did not know, committed the crime.[2] (Tr. 407, 442)

---

[2] Hurtado testified at trial that he lied to the police about his real name as well as whether he knew the men who shot him because he feared the police would discover that he had jumped bail a few years earlier in New Jersey following drug trafficking charges. (Tr. 408-10.) At trial, Hurtado also said that he could have been mistaken when he told the police a black man and a Hispanic man entered his apartment because of his condition when he was questioned. (Tr. 442.)

In response to a photo police showed Hurtado of Agudelo's ex-husband, Juan Marroquin (Tr. 442), Hurtado told police that Agudelo had problems with Marroquin and that Marroquin had been threatening her. (Tr. 428-29. 442.) Over the People's objection, the court allowed defense counsel to cross-examine Hurtado about whether he was "aware" of any threats Agudelo's ex-husband had made against her.[3] (Tr. 428-29.) Hurtado stated that Agudelo had told him that Marroquin once threatened her and that he was dying to get back with her because she was a good woman. (Tr. 428-29.) In addition, Hurtado recalled Agudelo telling him that Marroquin said to her over the phone, "If I can't have you, no one can."[4] (Tr. 429.) The police questioned Hurtado for two days; he was released from the hospital some days later. (Tr. 411.)

Seven years later, federal agents arrested Hurtado for drug violations, and discovered he had an outstanding warrant for jumping bail in a 1987 New Jersey drug case. (Tr. 408, 412, 417.) Hurtado ultimately pled guilty in the federal and New Jersey drug cases and received concurrent prison sentences of 46 months and seven years, respectively. (Tr. 412-13.) After his arrest, Hurtado reached out to the New York City Police Department to assist in the Agudelo shooting, which remained unsolved. (Tr. 413-14.) In March 2001, Hurtado spoke to Detective William Ahern and Assistant District Attorney ("ADA") Richard Schaeffer about the incident. (Tr. 413, 453, 491-92.) In October 2001, Hurtado led Detective Ahern to various locations connected to petitioner, who Hurtado named as one of the two assailants. (Tr 455.)

ADA Schaeffer and Hurtado testified that Hurtado was not getting anything in return for

---

[3] The court ruled that defense counsel could cross-examine Hurtado about the threats Agudelo had mentioned to Hurtado because he had given an inconsistent pretrial statement to the police, which included statements about Agudelo's problems with her "ex-husband." (Tr. 428.)

[4] The detectives who took these statements in 1992 are no longer on the force. (Tr. 434.)

his help in the case (Tr. 413-14, 492), but was assisting the NYPD because of his "obligation to [Agudelo], to Justice, and to God" (Tr. 414, 455). Hurtado did admit, however, that the prosecutor agreed to write a letter he could use in his challenge to deportation.[5] Hurtado nonetheless expected to be deported as a result of his two felony drug convictions. (Tr. 369, 416.)

Hurtado testified that he lied to police ten years earlier about not knowing his assailants because he was "frightened" that his "life was going to get very complicated" if the police uncovered his true identity along with his outstanding New Jersey warrant. (Tr. 409.) Hurtado stated he met petitioner while working as a middleman in a drug trade for a woman known as "Yolanda." (Tr. 370, 373.) Hurtado's job was to pick up the buy money for Yolanda and then deliver the drugs to the buyer. (Tr. 373.) The NYPD arrested petitioner on October 9, 2001 based on information provided by Hurtado. (Tr. 455-56.)

At trial, defense counsel elicited testimony that suggested petitioner was physically incapable of committing the crime. Petitioner's companion, Janeth Delgado, testified that in May of 1992, petitioner was in the hospital where he underwent surgery for a gunshot wound. (Tr. 517). Delgado stated that the wound, held closed with staples, ran from his chest, under his armpits, to his back (Tr. 521-22) and that after doctors discharged petitioner from the hospital (Tr. 515-16), petitioner stayed in her sixth-floor, Manhattan apartment for two and a half months. (Tr. 519). She stated that at the time, petitioner needed help walking, (Tr. 521). Marco Rosa, Delgado's friend, testified that he had helped transport petitioner to Delgado's apartment and that during his recuperation, petitioner walked "real slow." (Tr. 538, 540.) Rosa testified that

_____

[5] The prosecutor agreed to write a letter detailing Hurtado's cooperation in the case. (Tr. 414-15).

whenever petitioner left the building to visit the doctor, either he or Delgado had to help petitioner up and down the six flights of stairs. (Tr. 539-41; see also Tr. 533.) Delgado remembered that petitioner was still walking slowly and recuperating in her apartment on July 15, 1992, her birthday, nearly two weeks after the shooting. (Tr. 519, 533.)

Nevertheless, Medical Examiner, Dr. Laura Goldfetter testified that nothing in his medical records showed that petitioner "would have any type of problem walking in July [1992] or climbing stairs." (Tr. 550-51.) Delgado denied any knowledge of petitioner's alleged involvement with drugs. (Tr. 528-29.)

## PROCEDURAL HISTORY

On July 28, 2003, a jury found petitioner guilty of murder in the second degree, attempted murder in the second degree, and criminal possession of a weapon in the third degree. (Tr. 670-73.) The court sentenced petitioner to concurrent, indeterminate prison terms of twenty-two years to life for murder, ten to twenty years for attempted murder, and seven and one-half to fifteen years for criminal possession of a weapon. (Affidavit in Opposition to Petition for Writ of Habeas Corpus ("Aff. in Opp'n.") at 6.)

On February 17, 2004, petitioner filed a motion to vacate his judgment of conviction pursuant to section 440.10, of the New York Criminal Procedure Law. (Id.) Petitioner alleged that prior to trial, his counsel discovered that Agudelo filed charges against her ex-husband, Juan Marroquin, and had asked the Court to order the assistant district attorney to provide information regarding the accusation. (Id.) Petitioner's counsel claimed that he went to the clerk's office to request the file and was told that it would have to be ordered from archives and that he would be

notified when it was available. (Id.) Counsel further claimed that the Queens County Clerk's Office contacted him in July of 2003 but that when he went to the clerk's office on July 28, 2003, the file was unavailable and he was told it had to be reordered. (Id. at 6-7.) Counsel stated he was notified again in August that the file was available, but did not receive a copy of the file until August 28, 2003, a month after trial. (Id. at 7.) Petitioner argued that his conviction should be vacated because Agudelo's complaint against Marroquin was newly discovered evidence, which would have established that someone else had a motive to kill Agudelo. (Id.)

The Supreme Court, Queens County, denied petitioner's §440 motion on June 8, 2004, finding that petitioner's claim was barred because it could have been raised on the record. (Id. at 8-9.) In addition, the Supreme Court stated that petitioner's claim lacked merit. (Id.)

On June 21, 2004, petitioner moved for leave to appeal the denial of his motion to vacate. (Id.) On August 16, 2004, the Appellate Division granted petitioner's motion to consolidate his appeal of his motion to vacate with his direct appeal. (Id. at 10.)

Petitioner's appeal argued that there was insufficient evidence to support his conviction, that Hurtado was not a credible witness, and that he was denied a fair trial when the court read the indictment to the jury during preliminary instructions but failed to give the jury any instructions on reasonable doubt, the burden of proof, and credibility. (Id.) In addition, petitioner argued that he had been denied effective assistance of counsel. (Id.) On Aug. 4, 2005, petitioner filed a *pro se* supplemental brief, arguing he had been denied the right to be present at all stages of his trial because he was not present at a number of sidebar conferences. (Id. at 12.) Petitioner also argued that his conviction should be reversed because of "cumulative errors" that occurred during trial. (Id. at 13.)

On June 6, 2006, the Appellate Division, Second Department affirmed the judgment of conviction and the order denying petitioner's motion to vacate. People v. Diaz, 30 A.D.3d 436 (2d Dept. 2006). The court rejected petitioner's argument regarding the reading of the indictment, as well as petitioner's ineffective assistance of counsel claim. Furthermore, the court found no merit in petitioner's claim that he was denied the right to be present at critical stages of trial, and found that petitioner failed to preserve his "cumulative errors" claim. (Id.)

On June 20, 2006, petitioner moved in the Appellate Division to reargue the decision affirming his conviction. That motion was denied on September 12, 2006. On July 26, 2006, petitioner sought leave to appeal to the New York State Court of Appeals (Aff. in Opp'n. at 15.). On August 31, 2006, petitioner's leave application was denied. People v. Diaz, 7 N.Y.3d 812 (2006).

The instant petition for a writ of habeas corpus raises five grounds for relief: (1) that petitioner was denied his right to effective assistance of counsel, (Petition for Writ of Habeas Corpus ("Pet.") at 6-9);(2) that petitioner was denied his right to be present during all material stages of the proceedings, (Pet. at 10-12); (3) that the people failed to prove petitioner's guilt beyond a reasonable doubt, (Pet. at 13-15); (4) that petitioner's conviction was based upon insufficient proof as a matter of law, (Pet. at 15-17); and (5) that the cumulative effect of all the trial errors deprived petitioner of his right to due process, (Pet. at 18-20).

Petitioner moved for permission to file a memorandum of law to accompany his petition, and the Court granted his request. Petitioner submitted the memorandum of law on March 6, 2008. (Aff. in Opp'n at 17.)

On May 27, 2008, petitioner submitted an "Amended Petition," adding a claim that the

trial court erred in reading the indictment to the jury as part of its preliminary instructions. (Id.) Respondents opposed the amended petition, and requested an extension of time to file their response to either petition until after the Court had ruled on petitioner's request to amend. (Documents 18-19.) On September 29, 2008, the Court denied respondent's request "to the extent that the State shall respond to the amended petition by [October 20, 2008] . . . The application [was] otherwise denied without prejudice to renewal in response to the Amended Petition." (Document 20.)

## DISCUSSION

I. **Standard of Review**

Petitioner's claims are reviewed under the standards set forth in the Anti-terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. §2254. For claims that have been adjudicated on the merits in state court proceedings, a petitioner must show that the state court proceedings:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

This Court applies the AEDPA's deferential review to all grounds raised where the state court reached the merits of the constitutional claim. Norde v. Kean, 294 F.3d 401, 409 (2d Cir. 2002). To determine whether the state court reached an issue on the merits, the Court considers:

"(1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits." Sellan v. Kuhlman, 261 F.3d 303, 314 (2d Cir. 2001). If the state court did not reach the merits of the claim, then the court reviews the state court's ruling *de novo*, a less deferential standard. Norde, 294 F.3d at 409.

The Second Circuit has instructed that a "claim need not be addressed in detail by a state court to have been 'adjudicated on the merits.'" Howard v. Walker, 406 F.3d 114, 122 (2d Cir. 2005) (citing Ryan v. Miller, 303 F.3d 231, 245-46 (2d Cir. 2002)). In fact, all a state court is required to do is to "dispose of the petitioner's federal claim on substantive grounds, and reduce that disposition to judgment. No further articulation of its rationale or elucidation of its reasoning process is required." Aparicio v. Artuz, 269 F.3d 78, 93-94 (2d Cir. 2001).

A state court decision is "contrary to" clearly established Federal law if a state court: (1) "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law;" or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to[that precedent]." Williams v. Taylor, 529 U.S. 362, 405 (2000). Clearly established Federal law in §2254(d)(1) "refers to the holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the relevant state court decision." Id. at 412. Under the "unreasonable application" clause of the AEDPA, habeas relief is warranted only "if the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

The Supreme Court has ruled that the reasonableness of the application of the law is to be

assessed objectively rather than subjectively. Id. at 409-410. In addition, the Court cautioned

that "an *unreasonable* application of federal law is different from an *incorrect* application of

federal law." Id. at 410 (emphasis in original). Therefore, a "federal habeas court may not issue

the writ simply because that court concludes in its independent judgment that the relevant state-

court decision applied clearly established federal law erroneously or incorrectly. Rather, that

application must also be unreasonable." Id. at 411; accord Schriro v. Landrigan, 550 U.S. 465,

473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's

determination was incorrect but whether that determination was unreasonable–a substantially

higher threshold."); see also Sorto v. Herbert, 497 F.3d 163, 169 (2d Cir. 2007) ("While the

precise method for distinguishing objectively unreasonable decisions from merely erroneous ones

is somewhat unclear, it is well-established in this Circuit that the objectively unreasonable

standard of § 2254(d)(1) means that petitioner must identify some increment of incorrectness

beyond error in order to obtain habeas relief.") (Internal quotes and citations omitted).

## II.     Timeliness

### A.     The Initial Petition

The Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus
by a person in custody pursuant to the judgment of a State court. The limitation period shall run
from the latest of –

> (A) the date on which the judgment became final or by the conclusion of direct
> review or the expiration of the time for seeking such review;

> (B) the date on which the impediment to filing an application created by State

action in violation of the Constitution or laws of the United States is removed if the applicant was prevented from filing by such state action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. §2244 (d)(1). Generally, the statue of limitations period runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). A conviction is considered final "once the judgment of conviction [has been] rendered, the availability of appeal exhausted, and the time for petition for certiorari . . . elapsed." McKinney v. Artuz, 326 F.3d 87, 96 (2d Cir. 2003).

Petitioner's judgment of conviction became final on November 29, 2006, upon expiration of the 90-day period in which to seek a writ of certiorari. Thus, petitioner had one year from November 29, 2006, to file an application for writ of habeas corpus. Petitioner filed the instant application seeking a writ of habeas corpus on November 20, 2007,[6] nine days before the one-year limitations period was set to expire. Thus, the original petition was timely filed.

B.     The Amended Petition

Although respondent concedes that petitioner's original petition was timely, respondent argues that petitioner's amended petition is untimely. (Memorandum of law in Opposition to petition ("Mem. in Opp'n") at 42.) Where a petitioner wants to add a new claim to his habeas

---

[6] Although the petition was received by this Court on December 12, 2007, petitioner placed the petition in the prison mail at his facility on November 20, 2007. (Pet. at 23, 27); see Noble v. Kelly, 246 F.3d 93, 97-98 (2d Cir. 2001) (the "prison mailbox rule" applies to petitions seeking writs of habeas corpus).

petition after the expiration of the statute of limitations, the petitioner must prove that the proposed amendment "relates back" to the claims in the original petition. Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 815 (2d Cir. 2000). ("[W]e hold that Rule 15 (c) [of the Federal Rules of Civil Procedure] applies to 28 U.S.C. § 2254 petitions for habeas corpus."). An amendment relates back only if the claim to be added "arose out of the conduct, transaction, or occurrence set out . . . in the original pleading." Fed. R. Civ. P. 15(c)(1)(B).

In Mayle v. Felix, 545 U.S. 644 (2005), the Supreme Court interpreted Rule 15(c)'s "conduct, transaction, or occurrence" in the habeas context and advised that "[a]n amended habeas petition . . . does not relate back . . . when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." Id. at 650. Otherwise, "virtually any" proposed amendment would relate back for purposes of Rule 15(c). Id. at 657. In addition, the Court stated that relation back will not be proper unless "the original and amended petitions state claims that are tied to a common core of operative facts." Id. at 664.

Here, petitioner's amended claim that the trial court erred in reading the indictment to the jury as part of its preliminary instructions relates back to claims raised in the original petition. Petitioner's original petition raised that the court denied him a fair trial when the court instructed the jury to "assess and weigh the evidence as it is presented" but failed to instruct the jury on how to assess a witness's credibility and reasonable doubt. (Pet. at 2-3.) Although the original petition did raise "reading the indictment to the jury," the amended claim raises alleged errors committed by the trial court during its instructions, which relates to claims in the original petition. Moreover, the original petition raised that cumulative trial errors denied petitioner due process. Thus, petitioner's motion to amend should be granted as the amended petition relates

12

back to the original petition.

## III. Ineffective Assistance of Counsel

The Sixth Amendment's right to counsel includes the right to effective assistance of counsel. <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984). Counsel deprives a defendant of the right to effective assistance by failing to render "adequate legal assistance." <u>Id.</u> A petitioner demonstrates that counsel was constitutionally ineffective by showing that (1) petitioner's counsel was deficient and (2) that counsel's deficient performance prejudiced the defense. <u>Id.</u> at 687. Petitioner must show that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms." <u>Id.</u> at 688. "Judicial scrutiny of counsel's performance must be highly deferential" and a court should presume that counsel's performance "falls within a wide range of reasonable professional assistance." <u>Id.</u> at 689.

Petitioner argues that he was denied effective assistance of counsel because his attorney failed to obtain Agudelo's criminal complaint against her husband prior to trial. (Memorandum of Law in Support of Petition, Exhibit A.) However, counsel's failure to obtain Agudelo's complaint against her husband does not, by itself, show that counsel's conduct was deficient or "fell below an objective standard of reasonableness." <u>Strickland</u>, 466 U.S. at 688. Even without the complaint, petitioner's counsel cross-examined Hurtado about Agudelo's relationship with her ex-husband. Specifically, counsel questioned Hurtado and elicited testimony that he was aware that Agudelo's ex-husband had made threats against her. Counsel also elicited that Hurtado recalled Agudelo saying that her ex-husband threatened her and was "dying" to get back with her because "he had lost a good woman." (Tr. 426-29.) In addition, on cross-examination, Hurtado stated that Agudelo's ex-husband had told her, "If I can't have you, no one can." (Tr. 429.) Petitioner's

13

counsel may have been able to bolster the testimony he elicited had he obtained the criminal complaint Agudelo filed against her husband before trial, but his failure to do so did not deny petitioner effective assistance of counsel.

Even if petitioner's counsel's performance was found to be deficient, petitioner does not show that the failure to obtain Agudelo's criminal complaint against her husband had any effect on the outcome of the trial. Petitioner must show "that there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694; see U.S. v. Habbas, 527 F.3d 266 (2d Cir. 2008) (denying petitioner's ineffective assistance of counsel claim as he could not show prejudice).

Petitioner contends that had his counsel obtained the criminal complaint filed against her ex-husband, his defense would have been bolstered. (Memorandum of Law in Support of Pet. at 3.) Petitioner also asserts that counsel's failure to obtain the complaint was a Brady violation.[7] (Pet. at 7). However, Brady is inapposite to counsel's failure to obtain Agudelo's criminal complaint. There is nothing in the record to support any claim that the government had or suppressed Agudelo's criminal complaint against her husband. Moreover, petitioner's counsel argued that Agudelo's ex-husband could have been responsible for this crime when he cross-examined Hurtado about threats Agudelo's ex-husband had made against her. (Tr. 426-29.) Petitioner's counsel also undermined Hurtado's credibility when counsel elicited his admission that he is a two-time convicted felon (Tr. 421) and that he lied to police about his identity and the

---

[7] A Brady violation occurs where material evidence that is favorable to an accused person is suppressed by the government irrespective of good or bad faith. Strickler v. Greene, 527 U.S. 263, 280 (1999)(citing Brady v. Maryland, 373 U.S. 83, 87 (1963)).

identity of the person who shot him (Tr. 422). Because petitioner does not establish that his

counsel's failure to obtain Agudelo's complaint against her husband prejudiced him at trial, his

ineffective assistance of counsel claim should be denied.

IV.    **Right to be Present at Sidebar Conferences**

Petitioner claims that his rights were denied at trial because he was excluded from a

number of sidebar conferences. (Pet. at 11.) Respondent argues that petitioner's claim regarding

sidebar conferences is procedurally barred. (Mem. in Opp'n at 50.)

Federal courts will not review state court decisions on questions of federal law that rest

on adequate and independent state law grounds. <u>Lee v. Kemna</u>, 534 U.S. 362, 375 (2002) (citing

<u>Coleman v. Thompson</u>, 501 U.S. 722, 729 (1991)). However, where a state-court decision

"fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and

when the adequacy and independence of any possible state law ground is not clear from the face

of the opinion." the Court will not presume an independent and adequate state law ground exists.

<u>Id.</u> at 735; <u>see also</u> <u>Velasquez v. Leonardo</u>, 898 F.2d 7, 9 (2d Cir. 1990) ("[F]ederal habeas

review is foreclosed when a state court has expressly relied on a procedural default as an

independent and adequate state ground, even where the state court has also ruled in the

alternative on the merits of the federal claim").

Although respondent argues that the Appellate Division rejected petitioner's sidebar

claim "as being largely unpreserved and otherwise without merit" (Mem. in Opp'n at 50), a plain

reading of the appellate decision does not necessarily support this characterization of the holding.

The decision holds that "[t]he defendant's contentions that he was denied his right to be present

at certain sidebar conferences are *either* unreviewable *or* without merit since the proceedings at issue involved only questions of law or procedure." People v. Diaz, 30 A.D.3d 436 (2d Dept. 2006)(emphasis added). This language is ambiguous as to whether the court actually relied on a procedural bar (failure to preserve an appealable issue), or whether the court ruled on the merits. The latter interpretation would present a question interwoven with federal law. Therefore, plaintiff's claim here is not procedurally barred. See Cruz v. Smith, No. 05 Civ. 6070, 2009 U.S. Dist. LEXIS 31567 at *6 (S.D.N.Y. Jan. 15, 2009)(evaluating a claim on the merits, after the appellate state court rejected the claim "as *either* unpreserved for appellate review *or* without merit")(emphasis added). Nevertheless, the claim should be denied on the merits.

"[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." Kentucky v. Stincer, 482 U.S. 730, 745 (1987); accord Rushen v. Spain, 464 U.S. 114, 117 (1983). This right, however, is only implicated where the defendant's presence "has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." Fabricio v. Artus, No. 06 Civ. 2049, 2007 WL 119462 at *7 (S.D.N.Y. Jan. 11, 2007) (quoting Snyder v. Massachusetts, 291 U.S. 97, 105-106 (1934)). There is no constitutional right to be present "when presence would be useless, or the benefit but a shadow." Id. at 106-07.

Petitioner argues that he was denied a constitutional right because he was improperly excluded from twelve sidebar conferences.[8] (Pet. at 11)(citing Tr. 325, 356, 382, 415, 425, 434, 450, 492, 511, 521, 526, and 546.) Eight of the twelve sidebar conferences were held off the

---

[8] Petitioner concedes in his petition that he waived his right to be present at side bar during voir dire, but contends that the trial court failed to advise him of his "right to be present at all material stages of the trial (e.g. discussions, bench conferences, in-chambers discussions, etc.)." (Pet. at 11.)

record, and thus the record does not demonstrate that petitioner's presence would have affected

his defense. Moreover, none of the four recorded sidebar conferences were critical to the fairness

of the criminal proceeding. In the first recorded sidebar conference, the court instructed the

prosecution that it could not ask Hurtado about his legal opinion regarding the power of various

government agencies. (Tr. 415.) In the second and third recorded sidebar conferences, the court

permitted petitioner's counsel to cross-examine Hurtado regarding statements he made to the

police. (Tr. 425, 434.) In the final recorded sidebar conference, the court permitted the

prosecution to cross-examine Delgado, petitioner's companion, about petitioner's history selling

drugs. (Tr. 526-28.).

There is no reason to conclude that petitioner's presence at the sidebar conferences would

have had any "reasonably substantial" relation to his opportunity to defend against the charges,

since the sidebar conferences only concerned the scope of cross-examination. See .Wilson v.

Bennett, 188 F. Supp. 2d 347, 356 (S.D.N.Y. 2001)(denying petitioner's claim that he had a right

to be present at sidebar where the scope of cross examination was discussed). Petitioner was not

prejudiced by his absence from these sidebar conferences. The first conference narrowed the

scope of questions that the prosecutor could ask Hurtado, its lead witness. The second and third

conferences allowed defense counsel to cross-examine Hurtado regarding statements he made to

the police. In addition, petitioner's absence from the fourth on-the-record side-bar conference

had no affect on petitioner's ability to defend against the charge. Consequently, petitioner's

absence at the sidebar conferences did not affect substantially effect his ability to defend his case.

See Gaiter v. Lord, 917 F.Supp. 145, 152 (E.D.N.Y. 1996) (concluding that petitioner's presence

at sidebar was not required because it would not have had a substantial effect on her ability to

defend). Therefore, petitioner's claim regarding his right to be present at certain sidebar conferences should be denied.

## V. Proof Beyond a Reasonable Doubt and Insufficiency of the Evidence

Petitioner raises insufficiency of the evidence and failure to prove guilt beyond a reasonable doubt; both claims were decided on the merits in state court. (Pet. at 13-17.) The Due Process clause of the Fourteenth Amendment "prohibits conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged." Einaugler v. Supreme Court of State of N.Y., 109 F.3d 836, 839 (2d Cir. 1997) (quoting In Re Winship, 397 U.S. 358, 364 (1970)). When reviewing a state court conviction on these grounds, a federal habeas court considers "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). A petitioner challenging the sufficiency of the evidence of his guilt in a habeas corpus proceeding "bears a very heavy burden." Fama, 235 F.3d at 811. The reviewing court "must defer to the jury's assessments [of the weight of the evidence and the credibility of the witnesses]." Maldonado v. Scully, 86 F.3d 32,35 (2d Cir. 1996). Even when "faced with a record of historical facts that supports conflicting inferences [a court] must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Hudgins v. People of the State of New York, No. 07-CV-01862, 2009 WL 1703266 (E.D.N.Y. June 18, 2009) (quoting Wheel v. Robinson, 34 F.3d 60, 66 (2d. Cir. 1994)).

Petitioner contends that there was insufficient evidence to support a finding of guilt

beyond a reasonable doubt on his charges because the only evidence linking petitioner to the

crime was the testimony of Hurtado, a convicted drug dealer, who made inconsistent pretrial

statements regarding the events leading up to the shooting. (Pet. at 13.) Specifically, petitioner

argues that Hurtado told the police after the shooting that he did not know the individuals who

shot him and killed Agudelo, but said they were two black men, not a Hispanic man like

petitioner. (Petitioner's Memorandum of Law at 10). In addition, petitioner argues that Hurtado

is not credible because although he was arrested in 1999, he waited almost two years (until

March 2001) to talk to the police about the incident, and then did so out of a sense of honor to

the victim. (Id.) Petitioner, however, asserts that Hurtado's true motive for coming forward was

a letter the police offered to write to immigration authorities in exchange for his testimony,

detailing his cooperation in the case. (Id. at 10-11.) Finally, petitioner contends that other facts,

such as petitioner's own debilitating gunshot wound at the time of the shooting, as well as

forensic evidence found at the crime scene, contradicted Hurtado's description of the events. (Id.

at 11-13.)

However, petitioner fails to establish that "no trier of fact could have found the essential

elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319. Although petitioner

states that the only evidence linking petitioner directly to the crime is the testimony of Hurtado,

"[t]he testimony of a single, uncorroborated eyewitness is generally sufficient to support a

conviction." Goston v. Rivera, 462 F.Supp.2d 383, 392 (W.D.N.Y. 2006) (quoting United States

v. Danzey, 594 F.2d 905, 916 (2d Cir. 1979)). Moreover, "it is well-settled that when reviewing

the sufficiency of the evidence, we defer to the jury's assessment of witness credibility and the

jury's resolution of conflicting testimony." United States v. Glenn, 312 F.3d 58, 64 (2d Cir. 2002) (crediting the testimony of government witnesses, even though they had testified as cooperators and their testimony was "pock-marked" with inconsistencies); see Williams v. McGinnis, No. 04-CV-1005, 2006 WL 1317041 at *12-13 (E.D.N.Y. May 15, 2006) (inconsistent testimony of a crack addicted felon and an alcoholic with a profound psychiatric history was enough to prove petitioner guilty beyond a reasonable doubt). Here, whether Hurtado was credible is a matter entirely entrusted to the jury.

As to petitioner's claim that there was insufficient evidence to establish all of the material elements of the offenses (Pet. at 14-16.), petitioner's argument is unavailing. To convict petitioner of second degree murder, the State had to establish that petitioner, acting in concert with another, intentionally caused the death of Agudelo. N.Y. Penal Law § 125.25(1). The State also had to show that petitioner, acting in concert with another, intentionally attempted to cause the death of Hurtado to prove petitioner's guilt of attempted murder. N.Y. Penal Law §§ 110.00; 125.25(1). Finally, to prove petitioner's guilt of criminal possession of a weapon in the second degree, the State had to prove that petitioner, acting in concert with another, possessed a loaded firearm with the intent to use it unlawfully against another. N.Y. Penal Law § 265.03(1).

There is sufficient record evidence to establish the elements of the crimes charged beyond a reasonable doubt. Here, Hurtado identified petitioner–someone Hurtado knew well prior to the shooting–as the man who entered his apartment with an armed accomplice who shot Hurtado and Agudelo. (Tr. 401-06.) According to the testimony, petitioner repeatedly directed his accomplice to "kill" Hurtado. (Tr. 404.) Hurtado's testimony also established that petitioner had a motive to murder Hurtado and Agudelo: petitioner owed his drug supplier thirty-five thousand dollars, and

chose to kill Hurtado to avoid paying his debt. (Tr. 381-82, 389.) Therefore, there is sufficient

record evidence to support petitioner's guilt beyond a reasonable doubt, and the state court's

decision was not contrary to or an unreasonable application of clearly established Federal law.

Accordingly, petitioner's claims should be denied.

VI.     **Improper Preliminary Jury Instructions**

Petitioner claims that the trial court denied him his right to a fair trial during preliminary

instructions when it "outlined the elements of the charged crimes," but failed to give the jurors

any instruction on witness credibility or reasonable doubt, the burden of proof, and the

presumption of innocence. (Amended Pet. at 8.) Petitioner argues that the court's preliminary

instructions went beyond the minimum content required by state law, and created a risk of

preliminary deliberation, thereby denying him a fair trial. (Id.) While the respondent argues that

this claim is procedurally barred as unpreserved (Mem. in Opp'n at 43.), even if it is reached on

the merits, the claim should be denied.

"[T]o obtain a writ of habeas corpus in federal court on the ground of an error in a state

court's instructions to the jury on matters of state law, the petitioner must show not only that the

instruction misstated state law but also that the error violated a right guaranteed to him by federal

law." Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001) (quoting; Casillas v. Scully, 769 F.2d 60,

63 (2d Cir. 1985)); Sams v. Walker, 18 F.3d 167, 171 (2d. Cir. 1994). Habeas corpus relief is

not available for state law errors, but rather where state law errors result in "cognizable violations

of a constitutional right to due process." Davis, 270 F.3d at 123.

Petitioner states that his due process rights were violated because the trial court failed to

indictment to the jury, the court's preliminary instructions [illegible] ...

York law. See People v. Payton, 31 A.D.3d 580, 581 (N.Y. Sup. Ct. 2006)(holding that the court's reading of the indictment during preliminary jury instructions did not create the possibility of premature deliberations). State law does not mandate that a court give jurors instruction on witness credibility or the prosecution's burden at the beginning of a trial. See NY CPL § 270.40 (enumerating the required components of preliminary jury instructions)

Even if petitioner could show that the trial court committed an error of state law, petitioner fails to meet his burden of proving that an improper jury instruction violated his constitutional rights. A jury instruction is improper where it creates a presumption that relieves the prosecution of its burden to prove the elements beyond a reasonable doubt. Sullivan v. Louisiana, 508 U.S. 275, 280 (1993). An instruction that embodies an "ambiguity, inconsistency, or deficiency" does not by itself amount to a due process violation. Waddington v. Sarausad, --- U.S. --- ,129 S. Ct. 823, 831 (2009). Instead, the petitioner must show that there was a "'a reasonable likelihood' that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." Id. (citing Estelle v. McGuire, 502 U.S. 62, 72 (1991)). Morever, the Supreme Court has warned that the amount of infractions that violate "fundamental fairness" is very narrowly drawn. Estelle, 502 U.S. at 72. Further, the jury instruction in question "may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." Waddington, 129 U.S. at 831 (quoting Estelle, 502 U.S. at 72). The most important question to ask is "whether the

22

ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Id..

Petitioner has not met his burden on this claim. Before reading the indictment at preliminary instructions, the trial judge admonished the jurors "that the indictment is only the means that is used to bring the defendant before the Court, and it is not evidence of anything in this trial." (Tr. 264.) Moreover, the court instructed the jury on reasonable doubt, the burden of proof and on witness credibility when it delivered its final charge. (Tr. 632-63.) Thus, the trial court's preliminary charge to the jury, both on its own and in combination with the final charge, provided ample instruction to allow the jury to come to a reasoned verdict. Therefore, the state court's decision was not contrary to or an unreasonable application of clearly established Federal law, and petitioner's claim regarding the preliminary instructions should be denied.

VII. **Cumulative Errors**

Finally, petitioner claims that his conviction should be vacated in the interest of justice because the cumulative effect of the alleged constitutional errors "detailed throughout [his] petition" deprived him of his right to a fair trial. (Pet. at 18.)

Habeas relief may be justified based on the cumulative effect of errors that, standing alone, would not warrant the granting of a new trial. Taylor v. Kentucky, 436 U.S. 478, 487-88, n.15 (1978) ("the cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness."). But implicit in such a claim is, first, that the alleged individual errors a petitioner seeks to aggregate are actually errors. Cf. United States v. Lumpkin, 192 F.3d 280, 290 (2d Cir. 1999) (accumulation of non-errors does

not warrant a new trial); United States v. Hurtado, 47 F.3d 577, 586 (2d Cir. 1995) (rejecting claim that the collective impact of alleged errors warranted a new trial where the court committed only one error which was not itself sufficient to warrant a new trial). In addition, the cumulative errors must be "so prejudicial that they rendered petitioner's trial [] fundamentally unfair." Collins v. Scully, 878 F. Supp. 452, 460 (E.D.N.Y. 1995). The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." Dowling v. United States, 493 U.S. 342, 352 (1990).

As petitioner fails to establish actual errors, his claim regarding cumulative error is also without merit and should be denied.[9]

---

[9] Although respondent does not raise the argument, petitioner's cumulative-error claim is also likely procedurally barred, as the state court decision rested on an independent and adequate state law ground. See Diaz, 30 A.D.3d at 437 ("The defendant's contention that unspecified 'cumulative errors' that allegedly occurred at trial require the reversal of his conviction is unpreserved for appellate review.").

## CONCLUSION

Accordingly, the instant petition for a writ of habeas corpus under 28 U.S.C. § 2254 should be denied. Because petitioner has not made a substantial showing of the denial of any constitutional right, it is recommended that no certificate of appealability should be issued. 28 U.S.C. § 2253; see Lozada v. U.S., 107 F.3d 1011, 1017 (2d Cir. 1997), abrogated on other grounds, U.S. v. Perez, 129 F.3d 255, 259-60 (2d Cir. 1997) (discussing the standard for issuing a certificate for appealability); see also Lucidore v. N.Y. State Div. Of Parole, 209 F.3d 107, 112-13 (2d Cir. 2000), cert. denied, 531 U.S. 873 (2000). It is further recommended that the Court should certify pursuant to 28 U.S.C. § 1915(a) that any appeal from a judgment denying this petition would not be taken in good faith. Coppedge v. U.S., 369 U.S. 438 (1962).

## FILING OBJECTIONS TO THE REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. Any request for an extension of time in which to file objections must be made within the fourteen-day period. Failure to timely file an objection to the Report and Recommendation generally waives any further judicial review. DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000); Spence v. Superintendent, Great Meadow Corr. Fac., 219 F.3d 162, 174 (2d Cir. 2000); see also Thomas v. Arn, 474 U.S. 140 (1985).

SO ORDERED.

LOIS BLOOM
United States Magistrate Judge

Dated: July 12, 2010
          Brooklyn, New York